Harold E. Collins, J.
At this Huntley hearing the defendant, Jerome Tibbs, seeks to suppress an oral statement made to police officers in a police vehicle and a written statement made to a detective at the 5th Precinct station house of the Nassau County Police Department.
The facts, as found by the court, are as follows:
On March 12, 1974, police officers O’Connoll and Bennett of the Nassau County Police Department, while on duty in an unmarked car, received a radio call concerning a New York City burglary. The call described two individuals allegedly involved in the burglary and a vehicle in which they were riding. Following this call the officers responded to a call for assistance from another police car regarding two persons who had left an automobile and were running through yards in a residential area.
Upon arrival at the scene and upon searching the area, officer O’Connoll saw the defendant hiding in the hedges of a house on Joan Court in Elmont. O’Connoll drew his revolver and ordered the defendant to come out. After searching and handcuffing the defendant O’Connoll placed him in the police car. O’Connoll told Tibbs he was wanted for burglary.
While on the way to the 5th Precinct, O’Connoll read the four Miranda warnings to the defendant from a card. In reading from the card O’Connoll also asked if the defendant, Tibbs, understood and if he would be willing to answer questions without talking to a lawyer or having one present.
Thereupon, in response to a question from O’Connoll, Tibbs said he committed the burglary.
At this point the only burglary that O’Connoll was aware of was the burglary reported from New York City.
*9 Upon arrival at the 5th Precinct, Tibbs was taken to the detective’s squad room. Detective Meehan, who was on duty at the time, thereupon read the four Miranda warnings to the defendant from a card similar to the one used by O’Connoll and repeated also the statement as to whether he understood and whether he would answer questions without a lawyer.
Meehan thereupon questioned Tibbs who at that time denied committing any crime and said he came from New York City by bus. Meehan at this time did not know if a burglary was committed in Nassau County.
During the course of the questioning Tibbs was also questioned by New York City detectives and the testimony indicates that he was viewed by a woman, presumably the New York City complainant, who could not identify Tibbs.
In the meantime the automobile abandoned at the scene where Tibbs was found was in police custody and articles found in the car bore a Nassau County address.
Upon checking with a bus company, it was determined that it was not possible to get to the location where Tibbs was found by bus and Tibbs was advised of this. Tibbs then admitted that he committed a burglary but did not think it was in Nassau County.
Tibbs was then shown a map on the wall and he gave the police a general description of the area.
Tibbs thereupon accompanied several police officers in a car and drove back to the scene of the alleged burglary. After driving around in the area, Tibbs picked out the house where he said he committed the burglary. The address of the house picked out by Tibbs was 96 Hathaway Avenue, Elmont, located near the New York City line.
Upon returning to the station house, Tibbs gave a statement to Detective Meehan which was reduced to writing. Tibbs was asked to read the statement and correct any mistakes. He was also told to initial any mistypes in the statement which he did. After reading the statement Tibbs signed it in the presence of Meehan and another police officer. Tibbs had told Meehan he had a twelfth grade education so Meehan knew he could read.
Tibbs was permitted to make a telephone call and he called his wife.
Meehan, at the hearing, testified that he possibly told Tibbs *10 that if he showed them the house, he would not be charged with the stolen car.
All of the police officers who testified stated that Tibb’s physical condition was normal, that he did not complain about being sick, did not complain about stomach pains, did not vomit and no one hit him in their presence.
Dr. Galati, the jail physician, called as a defense witness, testified that after examining Tibbs at the Nassau County Jail on March 14, 1974, he formed an opinion that Tibbs was in heroin withdrawal.
In the main, the doctor’s opinion was based on the subjective symptoms of the defendant and the defendant’s past drug history as related by the defendant.
Dr. Galati also testified that the jail medical records showed that Tibbs responded to a question by stating that he "felt pretty well”.
When arraigned before Judge Edstrom of the District Court prior to being remanded to the county jail, Tibbs did not complain of withdrawal symptoms.
The court concludes as a matter of law that prior to making both the oral and written statements, the defendant properly received the appropriate warnings mandated by Miranda v Arizona (384 US 436) and that by his acts and conduct he knowingly, intelligently and voluntarily waived his privilege against self-incrimination and his right to counsel. (People v Fenuta, 39 AD2d 674, 675; People v Ruiz, 34 AD2d 908.)
While it is true that at the time of the oral statement in the police vehicle the police officer was unaware of the Nassau County burglary, it is apparent that Tibbs was referring to the premises which he said he burglarized and which were actually located in Nassau County near the New York City line and his own testimony at the hearing confirms this fact. In view of the circumstances under which the defendant was found in Nassau County, it is clear, therefore, that the officer had probable cause for taking the defendant into custody. (People v Lane, 10 NY2d 347, 353.)
Indeed, even if the arrest of the defendant and his consequent detention were deemed to be illegal, a finding would not be mandated, ipso facto, that the statements made by him were involuntary. Questions concerning unlawful arrest and detention are merely circumstances to be considered in determining the voluntary nature of a confession. (People v Ever *11 ett, 10 NY2d 500, 507; People v Robinson, 45 AD2d 909.) On the state of the record as it exists in this matter, it is the opinion of the court that any such issues would have to be resolved in favor of the volunatiness of the statements made by the defendant.
Although it would appear that Detective Meehan probably told Tibbs that if he showed the officers the house he burglarized, he would not be charged with the stolen car, the record in this matter does not support the inference that the statement by the detective created a substantial risk that the defendant might falsely incriminate himself. (CPL 60.45, subd 2, par [b].)
Indeed, a more appropriate conclusion may be drawn that upon being confronted with the information that he could not have gotten to the Elmont area by bus, as he first claimed, and upon being shown articles found in the car having a Nassau County origin, Tibbs recognized the realities of the dilemma in which he found himself and decided to give a statement. (See People v Carbonaro, 21 NY2d 271, 279.) Moreover, Tibbs admitted by his testimony that he was not charged with any crime concerning the car and thus it would be apparent that the detective in no measure misled him. (People v Rittenhouse, 37 AD2d 866, 867. See, also, People v Caserino, 16 NY2d 255, 259.)
As was significantly noted in United States v Ferrara (377 F2d 16, 17) concerning the matter of a promise: "The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant’s] will to resist and bring about confessions not freely self-determined * * *’.” (See, also, United States v Arcediano, 371 F Supp 457; People v Solari, 43 AD2d 610, 612.)
To the same effect the defendant’s claim must be rejected that his statements were involuntary because he was suffering from drug withdrawal at the time he gave them. Although the record is by no means conclusive with regard to the defendant’s claim, even if it be assumed that the defendant was experiencing withdrawal stymptoms, the test to be applied is whether his will was so overborne by the condition as to render him unable to understand the voluntary nature of the statements made by him. (People v Ellerbee, 32 NY2d 770; *12 People v Adams, 26 NY2d 129; People v Schompert, 19 NY2d 300.)
The acts and conduct of the defendant during the course of the police interrogation clearly negate any claim of involuntariness in this matter. He was able to give his name and address; he was aware of the extent of his educational background; he was able to telephone his wife; he was sufficiently alert to correct certain mistyped words in the written statement; he was able to pick out the general area of the burglarized house on the wall map at the station house and he was able to direct the police officers to the particular house in Elmont that was the subject of the alleged crime. Since actions of this nature, together with other courses of conduct as appear in the record, are inconsistent with an inability to make free and voluntary choices the defendant’s claim must fail.
For the reasons indicated herein the motion of the defendant to suppress is denied.